Jeffrey T. CANIFF, Appellant

v.

CSX TRANSPORTATION, INC., Appellee.

No. 2012–SC–000750–DG.

Supreme Court of Kentucky.

Aug. 21, 2014.

Alva A. Hollon, Jr., Thomas Ira Eckert, Hazard, Counsel for Appellant.

Linsey Walker West, Lexington, Kara MacCartie Stewart, Lexington, Michael B. Kimberly, Dan Himmelfarb, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

Jeffrey Caniff, Appellant, filed suit against his employer, CSX Transportation, Inc. (CSXT), in Perry Circuit Court pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60. The trial court granted CSXT's motion for summary judgment and Caniff appealed that decision to the Court of Appeals, which affirmed. Caniff sought discretionary review with this Court, which we granted. We now reverse and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

Caniff began his career with the railroad in 1979.[1] While Caniff was laid off several times during his railroad career (once for a period of several years), he eventually obtained a second shift job working as a carman at the Russell Yard. As a carman, Caniff's responsibilities were to inspect trains, attach or "lace up" hoses, and release hand brakes. His job description required him to "lift up to 70 pounds occasionally and up to 100 pounds on a rare basis." Caniff sustained an unrelated work injury in 1999 or 2000 which required neck surgery (a cervical fusion) and led to decreased strength in his left arm. He testified that after this injury, he required assistance in completing some tasks at work that he had been able to perform on his own prior to the injury.

1. CSXT did not exist in 1979; rather, Appellant was hired by the Chessie System, which eventually merged with other entities to become CSXT.

As a carman, Caniff generally worked with the same crew from day-to-day on one particular train. However, the circumstances in the rail yard on December 10, 2004, required him to perform tasks that were not typically part of his job. On that day, a train separated on the main line in the rail yard and was blocking the crossing. The worker who would usually go out to make the repair (called the high rail man [2]) had been assigned to fill in for another worker who missed work that day, and Caniff's supervisor told him to go out and make the repair rather than performing his normally-assigned duties.

Caniff drove the high rail out to the separated train in order to ascertain the problem. Since there was not an open track next to the train, Caniff drove the high rail on the road next to the track, like a regular truck. Because it had been raining in the preceding days, there were several deep mud holes and Caniff was unable to get closer to the car in question than two-hundred feet. When he saw the separation was caused by a broken knuckle,[3] he drove the truck back to retrieve a replacement knuckle. Caniff asked his immediate supervisor if another employee could assist with this job, but he was instructed that employee was unavailable and to "do what you can do." As Caniff returned with the replacement knuckle, he approached the car in need of repair as closely as he could in the truck (but was still two- or three-hundred feet away due to the poor condition of the road).

While Caniff had carried knuckles by himself in the past, he testified that had never done so on the main line. The crushed gravel, called ballast, used on the main line was larger than that used in the rest of the yard. Caniff's fact witness, John Quillen, another CSXT employee, testified during his deposition that some of the ballast on the main line was the size of a softball or a fist. The yard conditions were more hazardous than usual, as it had been raining the previous days and was misting on the day in question.

Caniff had carried the 75– to 90–pound knuckle waist high approximately 80 feet [4] on the wet main line ballast before he lost his footing and fell while climbing over a rail on the main line. At the time, he was attempting to step from the level ground of the rail bed onto the slope at its side, as was necessary so that he could approach the train car from the appropriate side in order to replace the knuckle. Per CSXT's instruction, Caniff carried the knuckle waist-high and close to his body. Both Caniff and John Quillen, another CSXT employee, testified in their depositions that this was the appropriate manner for one person to carry a knuckle. Caniff testified in his deposition that he could not see his feet while carrying the knuckle in this manner.

When Caniff lost his footing and began to fall, he twisted to the side, heard a popping sound, and felt a vibration in his spine. He thought at first that perhaps this fall had just aggravated his old neck injury or that he had merely "pulled something" and believed that his symptoms would dissipate with time. Caniff did not carry the knuckle the remaining distance

---

**2.** The high rail is the truck CSXT uses to carry tools and parts out to trains. It can either drive on wheels (like a regular truck) or on rails.

**3.** A knuckle is the coupler that holds train cars together. It weighs between 75 and 90 pounds.

**4.** We note that there is a difference between lifting 70 to 100 pounds as required by Caniff's job description and being asked to carry that same amount of weight 200 to 300 feet.

(more than 100 feet) to the car in need of repair, but he did assist the conductor with its installation. Caniff worked a few more days in December of that year before seeking medical attention. Eventually, Caniff saw several doctors for his injury. The last day Caniff worked was January 3, 2005, when he clocked in for one hour in order to get paid for the New Year's holiday.

Caniff sued CSXT in Perry Circuit Court under FELA. He asserted that CSXT was negligent under FELA in its maintenance of the ballast and for having him carry a heavy knuckle without sufficient mechanical or manual assistance. The trial court granted CSXT's motion for summary judgment on the grounds that "(1) [Caniff] failed to identify any act or omission by CSXT with respect to its premises that caused or contributed to [Caniff's] slip and fall on December 10, 2004, and (2) [Caniff] had no expert testimony to support his negligence claim regarding the knuckle." The trial court reasoned that expert testimony was required to determine whether carrying a knuckle alone for 200 feet was consistent with industry practice. Once the trial court granted summary judgment on Caniff's negligence claims in favor of CSXT, Caniff failed to raise the ballast maintenance issue at the Court of Appeals. Therefore, we will only consider whether summary judgment was proper on the issue of CSXT's negligence in requiring Caniff to carry the knuckle without sufficient mechanical or manual assistance.

## II. ANALYSIS

■■■■ Caniff brought his claim in Perry Circuit Court pursuant to FELA, which provides in pertinent part:

every ... railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ...

for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C.A. § 51. Thus, for an employee to have a claim under FELA, he need only show that his injury resulted *in part* from the railroad's negligence. In fact, the employee's burden in a FELA case is simply to establish that his or her "employer['s] negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Rogers v. Missouri Pac. R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) (footnotes omitted).

As this Court explained in *CSX Transp., Inc. v. Begley,* "the substantive law that governs a FELA action is federal, regardless of whether it is brought in state or federal court. Federal decisional law governs what constitutes negligence in a FELA claim and requires a plaintiff to prove the traditional common-law elements of negligence, including duty, breach, foreseeability, causation, and injury in order to prevail." 313 S.W.3d 52, 58 (Ky.2010) (footnotes omitted).

■■■■ While federal law governs the substantive issues in the case, as we further explained in *Begley,* "[t]he law of the forum governs procedural matters when a FELA claim is tried in state court." *Id.* at 59. We have also held "summary judgment is a procedural issue, and therefore should be examined under the law of the state where the action was brought." *Lipsteuer v. CSX Transp., Inc.,* 37 S.W.3d 732,

735 (Ky.2000). Therefore, we will review the trial court's grant of summary judgment under Kentucky law.

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. We explained in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.:*

> While it has been recognized that summary judgment is designed to expedite the disposition of cases and avoid unnecessary trials when no genuine issues of material fact are raised, ... this Court has also repeatedly admonished that the rule is to be cautiously applied. The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor. Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact. The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. It clearly is not the purpose of the summary judgment rule, as we have often declared, to cut litigants off from their right of trial if they have issues to try.

807 S.W.2d 476, 480 (Ky.1991) (internal citations omitted).

■ "Because summary judgments involve no fact finding, this Court will review the circuit court's decision *de novo.*" *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.,* 174 S.W.3d 440, 445 (Ky.2005). On appeal, "[t]he standard of review ... of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law. Summary judgment is appropriate where the movant shows that the adverse party could not prevail under any circumstances." *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.,* 90 S.W.3d 46, 49 (Ky.2002).

■ CSXT argues that we should not review this case under the de novo standard set forth above, but, rather, under the abuse of discretion standard set out in professional negligence (particularly medical malpractice) cases when the trial court is determining the necessity of an expert witness. We point out that, in those cases, the need for an expert is the rule rather than the exception. In *Baptist Healthcare Sys., Inc. v. Miller,* the hospital moved for summary judgment on the grounds that the patient had not produced an expert witness as to the standard of care of a phlebotomist. The trial court denied the hospital's motion and, instead, gave the patient thirty days to obtain an expert to testify. We affirmed this denial of summary judgment, stating:

> At the outset, we observe that while the trial court's ruling with regard to the necessity of an expert witness was within the court's sound discretion, ... this issue was not so clear-cut that reasonable persons could not have differed. This Court has rendered numerous decisions in the medical negligence context in which expert witnesses were not required on the view that a lay juror was competent to analyze the conduct and render an appropriate verdict without the assistance of an expert witness. As phlebotomy is an unlicensed field of practice and as numerous other medical providers routinely perform phlebotomy services, from the evidence is was not unreasonable for Ms. Miller to contend

that no expert witness was necessary to determine that her injuries were caused by leaving the tourniquet her patient's arm too long or that the principle of *res ipsa loquitur* applied to the case. However, the trial judge, acting well within her discretion, saw it otherwise. In view of the foregoing, the trial court properly exercised its discretion to announce a ruling on the necessity of an expert witness and to grant Ms. Miller a reasonable time in which to procure an expert. *Under these circumstances, not only did the trial court not err in failing to grant summary judgment, to have done so would have been extraordinary.*

*It is inappropriate to use a CR 56 summary judgment to resolve what is essentially a procedural dispute as to the need for an expert ....* In such disputes, it is within the trial court's discretion to impose sanctions for failure to comply *rather than to grant a summary judgment* as a procedural sanction except in rare cases.

177 S.W.3d 676, 681–82 (Ky.2005) (footnotes omitted; emphasis added).

In another more recent (and more divided, with a majority of four Justices), we considered a case where: "[t]he central question in this medical malpractice case is whether and when a trial court may grant summary judgment against a plaintiff who has failed to identify any expert witnesses." *Blankenship v. Collier*, 302 S.W.3d 665, 667 (Ky.2010). We affirmed the trial court's grant of summary judgment in that case by first determining that no issue of material fact existed, as the plaintiff presented no expert testimony to show the standard of care. *Id.* at 668 ("without a doubt, there is no genuine issue of material fact in the record because Collier has no expert to support his claim of medical negligence").

We then went on to hold that the trial court had not abused its discretion:

The trial court's determination that a sufficient amount of time has passed and that it can properly take up the summary judgment motion for a ruling is reviewed for an abuse of discretion.... Because Collier never disputed that a medical expert was necessary to prove his claim of medical negligence and continually represented to the trial court that he would obtain an expert witness, no separate ruling stating the obvious—the need for an expert witness—was required before the court ruled on the defendants' summary judgment motions.... Having carefully reviewed the record, we conclude that the defendants' summary judgment motions were properly before the trial court and it did not abuse its discretion in taking them up....

*Blankenship v. Collier*, 302 S.W.3d 665, 668–69 (Ky.2010).

The *Blankenship* case is readily distinguishable from the case at bar. *Blankenship* was a medical malpractice case. In fact, we even pointed out in that case that, "pursuant to Kentucky law, in most medical malpractice cases, a plaintiff is required to put forth expert medical testimony to establish the applicable standard of care, any breach that occurred and any resulting injury to the plaintiff." *Id.* at 667. The case at bar is not a medical malpractice case, or any other type of professional negligence case. At its root, this case is a normal "slip and fall" case.[5] Un-

---

5. The dissent insists that this is not an accurate assessment of the nature of the case at bar; and that, in fact, this portion of Caniff's claim was abandoned below. As we previously stated, Caniff did fail to appeal his claim that CSXT's *negligent failure to properly maintain the ballast* contributed to his injury, that has no bearing on our characterization here-

der FELA, the jury is asked to determine whether CSXT's negligence played *any* role in Caniff's injuries. *Blankenship* is also unlike this case in that the trial court there granted summary judgment based upon an *undisputed* need for an expert witness. There was no such undisputed need for an expert witness in the case at bar.

Summarizing our standards in a case such as this, the Court of Appeals held, citing *Baptist Healthcare:* "[w]hile a review of summary judgment is *de novo,* a trial court's ruling with regard to the necessity of an expert witness is within the court's sound discretion. Thus, we review the trial court's ruling in regard to the necessity of an expert witness for an abuse of discretion." *Celina Mut. Ins. Co. v. Harbor Ins. Agency, LLC,* 332 S.W.3d 107, 111 (Ky.App.2010) (internal quotations and citations omitted). We have held that "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

██ Applying that standard, the trial court abused its discretion in the case at bar by granting summary judgment pursuant to Caniff's failure to obtain an expert witness, as there were material facts at issue. Experts are often required in complex cases in which a jury will not understand, through common knowledge or experience, the intricacies involved in the negligence claim. This is simply not one of those cases. Here, the duty, breach, foreseeability, causation, and injury which Caniff must prove in order to succeed in his action under FELA can be readily understood by the jury without the aid of an expert witness. Furthermore, there was no undisputed need for an expert, as existed in *Blankenship.* Therefore, pursuant to *Baptist Healthcare,* "[i]t is inappropriate to use a CR 56 summary judgment to resolve what is essentially a procedural dispute as to the need for an expert...." 177 S.W.3d at 682.

As previously stated, Caniff presented evidence through his depositions and answers to interrogatories and through Quillen's deposition. Both men testified that, at the time of Caniff's fall, two CSXT employees could carry a knuckle together by inserting a metal rod through the knuckle. Using this technique, each employee would carry one side of the bar waist high, and both of them would retain the ability to visualize their feet in order to see where they stepped. Quillen also testified in his deposition that the Russell Yard acquired a "knuckle mate" in 2009, which was a device that enabled two men to carry a knuckle together without the use of a bar. Quillen stated that the task was now a "two-man job."[6] Both men

---

in. We are still dealing with facts where Caniff fell and was injured while attempting to follow instructions at work requiring him to individually negotiate a rail yard with raised rails built on crushed-rock ballast while carrying a 75– to 90–pound piece of equipment 200 to 300 feet (or however far he could make it) without assistance. Facts which would, of themselves, have great import to a lay jury from Perry County, Kentucky.

The dissent also points out that Caniff did not *actually* carry the knuckle the required two- to three-hundred feet in order to repair the rail car. We agree with this assessment. Caniff made it about one-third of the way while carrying the knuckle alone, unable to see his feet or the ground on which he was stepping, before falling.

6. While we acknowledge that this "subsequent remedial measure" would not be admissible under KRE 407 for the purpose of proving negligence, it may have still been admissible under the rule to prove "ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." KRE 407.

also testified that if one employee carried the knuckle by himself that it was to be carried waist high and close to the body (in a manner that necessarily obstructs the carrier's view of his feet).

Caniff testified that he asked his immediate supervisor for help in repairing the train that was blocking the crossing, but was told to do what he could alone. Quillen testified that, while he had carried knuckles on his own in the past (before 2009), if help was available, he utilized it. Caniff had carried knuckles by himself in the past, but he had never done so on the main line, where he had to contend with both the slope on the sides of the rail bed and the, at times, unstable ballast, which both he and Quillen testified was larger than that in the rest of the yard.

Here, Caniff was instructed to repair a train blocking a crossing. He knew that everything else in the rail yard was being held up waiting for this repair. He asked for assistance, which was denied. He approached the broken car as closely as possible and then carried the 75– to 90–pound knuckle in the manner he was instructed to by his employer, CSXT, which obstructed his view of his feet. In order to reach the car in need of repair, Caniff had to negotiate terrain that included going up and down sloping ballast and stepping over train tracks. Caniff claims that his injury was caused by CSXT's failure to provide him with adequate manual or mechanical assistance—and this was an appropriate question for the jury.

■■ Looking at the case in a light most favorable to Caniff and resolving all doubts in his favor, we hold that, even absent expert testimony, there are issues of material fact present in this case and, therefore, summary judgment was not proper. *Steelvest*, 807 S.W.2d at 480. At any rate, we are at an utter loss as to why an expert would be required in a case such as this. Lay jurors can determine whether CSXT's actions were negligent in this case without any such testimony to explain to them the standards as they existed in the railroad industry at the time of Caniff's injury. While it would be within the discretion of the trial court to allow an expert witness to testify as to these industry standards in this case, it is not within its discretion to *require* as much in order for Caniff's case to survive a motion for summary judgment.[7] Therefore, the trial court abused its discretion in granting CSXT's motion for summary judgment and requiring an expert witness for issues which were within the common knowledge and experience of the jury.

## III. CONCLUSION

Because issues of material fact as to whether Caniff's injuries "result[ed] in whole or in part from the negligence of any of the officers, agents, or employees" of CSXT, 45 U.S.C.A. § 51, existed in Caniff's case, and because the issues were within the common knowledge and experience of the jury, summary judgment was improper. Thus, we reverse and remand to the trial court for further proceedings consistent with this opinion.

---

7. The dissent fails to apply our standard for summary judgment set out in *Steelvest* to the facts of this case; rather, it only focuses on whether the trial court abused its discretion in requiring an expert witness. While that is part of our analysis, the ultimate question we are asked to resolve is whether the trial court erred in granting summary judgment. In order to do so, we must look at the case in a light most favorable to Caniff and resolve all doubts in his favor. We reiterate that summary judgment is the improper avenue to resolve a dispute regarding the need for an expert witness. *Baptist Healthcare,* 177 S.W.3d at 682.

CUNNINGHAM, KELLER, NOBLE, and VENTERS, JJ., concur. MINTON, C.J., dissents by separate opinion in which ABRAMSON, J., joins.

MINTON, C.J., Dissenting.

I dissent from the majority opinion because I cannot conclude that the trial court abused its discretion in concluding that expert testimony was necessary for Caniff to prove his prima facie negligence case.

Expert testimony may be required when the trial court determines that the subject matter of litigation is not within the common knowledge of lay jurors.[8] Because this determination falls squarely within the trial court's discretion, it may only be reversed on appeal if it "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[9]

Contrary to the majority's characterization of the nature of the underlying suit, the heart of this matter is not a normal slip-and-fall case. In fact, before incorrectly labeling this case as such, the majority acknowledges that Caniff abandoned his slip-and-fall claim on appeal to the Court of Appeals and does not reprise that claim before this Court. Properly characterized, the heart of the underlying litigation is whether CSXT failed to provide Caniff with sufficient manual or mechanical assistance to transport the knuckle, thus, creating an unreasonable risk of traumatic injury.

FELA requires CSXT to provide its employees with a reasonably safe workplace.[10] As part of this duty, CSXT is required to furnish its employees with sufficient tools and manpower to complete assigned tasks safely.[11] The tools and manpower necessary to complete a job must necessarily be viewed in light of the normal requirements of the job.[12] Just as a "yardman dealing with moving cars cannot expect the same safety as a clerical worker in a ticket office[,]"[13] the tools and manpower necessary to complete a task must be determined with reference to the relative dangers posed by the task, as well as the technical and logistical considerations concomitant with operating a railroad.[14]

Continuing its analysis under the false pretense that this is a simple slip-and-fall negligence case, the majority proclaims itself to be at an "utter loss as to why expert testimony would be required" and finds the trial court's decision to be an abuse of discretion. Were the majority's slip-and-fall label correct, I, too, would be at an utter loss as to why expert testimony would be required in such a simple case. But that is not the present case. Here, the jury is not asked to assess the negligence of a landowner in causing an invitee's injury. It will instead be charged with determining what level of assistance, if any, is reasonable for a railroad to afford its employees when transporting a 75– to

8. *Baptist Healthcare Sys., Inc. v. Miller,* 177 S.W.3d 676, 680 (Ky.2005).

9. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000).

10. *Van Gorder v. Grand Trunk W.R.R., Inc.,* 509 F.3d 265, 269 (6th Cir.2007).

11. *Blair v. Baltimore & O.R. Co.,* 323 U.S. 600, 604–05, 65 S.Ct. 545, 89 L.Ed. 490 (1945).

12. *See Conway v. Consolidated Rail Corp.* 720 F.2d 221, 223 (1st Cir.1983).

13. *Id.*

14. *See Van Gorder v. Grand Trunk W.R.R. Inc.,* 509 F.3d at 269 ("Under FELA, a railroad has a duty to provide its employees with a reasonably safe workplace; this does not mean that a railroad has the duty to eliminate all workplace dangers, but only the duty of exercising reasonable care to that end.") (internal quotation marks omitted).

90–pound knuckle.[15]

When viewing this issue through its proper lens, the logic behind the trial court's decision that the level of assistance a railroad is required to provide its employees is not common knowledge becomes clear. When the venire consists of citizens from various walks of life and employment backgrounds, from clerical office workers to the heartiest of physical laborers, it is realistic for the trial court to recognize that jurors from these varying backgrounds will have cultivated their own ideas of what level of personal physical exertion is reasonable. These ideas will be based on the jurors' personal experiences in the work force, not necessarily experiences working in rail yards. Indeed, any member of this Court would likely shrink at the thought of being required to carry a 75–pound knuckle alone; but a lumberjack, logger, or farmer may take that burden in stride as one of the least physically strenuous jobs in a day's work.

These experience-based beliefs are expected when the jury is asked to decide issues calling for common experience— *e.g.*, all jurors will have experience as invitees on the premises of another and can easily understand what risks of harm are unreasonable for invitees to be presented with. But, here, it is clear to see that the experience of working in a rail yard is not nearly as widespread as the experience necessary to understand a simple slip-and-fall case. "[T]he business of operating a railroad entails technical and logistical problems with which the ordinary layman has had little or no experience." [16] Without the benefit of expert testimony to inform jurors of the prevailing standard of practice within the railroad industry,[17] lay jurors would be asked to determine what amount of assistance was reasonable for CSXT to provide, armed only with the standard of reasonableness that applies in their own life experiences. Accordingly, I would conclude that the trial court did not act unreasonably and did act within the

**15.** Both Caniff and the majority stress that Caniff was attempting to carry the knuckle 200–300 feet. I find that fact to be of less importance because the record is clear, and the majority acknowledges, that Caniff only carried the knuckle 80 feet before becoming injured. The distance he was attempting to traverse is of minimal relevance because it only marginally impacts his injuries. Although attempting to carry a knuckle 200–300 feet may sound egregious, Caniff was just as likely to have been injured if he were required to transport the knuckle 81 feet as if he were required to carry it 1,000 feet.

**16.** *Bridger v. Union Ry. Co.*, 355 F.2d 382, 389 (6th Cir.1966).

**17.** *See Baptist Healthcare*, 177 S.W.3d at 680 ("Expert witnesses give the jury the ability to evaluate the conduct of the party charged with malpractice in the context of the discipline."); *Carman v. Dunaway Timber Co., Inc.*, 949 S.W.2d 569, 571 (Ky.1997) ("The trial judge correctly permitted Dunaway to introduce evidence of custom within the industry to prove this standard of care."); *Con-*

*way*, 720 F.2d at 223 (finding a plaintiff did not prove his prima facie FELA case where he "introduced no evidence that any other railroad had a rule on this subject[,]" and presented no "expert testimony, either as to need, or ... regulat[ion]."); *Kuberski v. N.Y. Cent. R. Co.*, 359 F.2d 90, 93 (2d Cir.1966) ("If 'good industry practice' is to be the touchstone differentiating negligent from non-negligent conduct, it would seem to be imperative for the plaintiff to prove [the defendant acted] contrary to good industry practice[.]"); *Wilson v. Norfolk & W. Ry. Co.*, 109 Ill.App.3d 79, 64 Ill.Dec. 686, 440 N.E.2d 238, 248–49 (1982) ("Industry practice is the yardstick against which a railroad's actions must be judged, and is the proper measure of negligence, except when that industry practice is not reasonable."); *see also Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 603 (6th Cir. 2013) (holding expert testimony is not required in FELA case where the hazard at issue was a "recognized hazard in the railroad industry").

confines of discretion in deciding that this issue of litigation is beyond the common knowledge of the jury, thus requiring Caniff to present expert testimony.[18] I also feel compelled to note that simply because an appellate court might have reached a different conclusion on the necessity of expert opinion does not mean the trial court's decision was unreasonable and an abuse of discretion. And that is not to say that expert testimony is always needed in inadequate-assistance cases prosecuted under FELA. The circumstances surrounding the underlying injury may fall squarely within what the trial court determines to be the common knowledge of the jury. Beyond these cases, even more may result from assistance levels so grossly negligent that no expert testimony is needed, just as in some professional negligence cases.[19]

I also disagree with the majority's view that "even absent expert testimony, there are issues of material fact." In reaching this conclusion, the majority points to Caniff's testimony that two persons *could* carry a knuckle jointly and Quillen's testimony that CSXT has considered transporting a knuckle to be a "two-man job" since obtaining a "knuckle mate" in 2009. Caniff's testimony is, at best, evidence of an alternate method and, at worst, a conclusory allegation of negligence. Simply because an alternative exists, or a plaintiff asserts that his injury would not have happened if a different technique were used,

does not necessarily raise a material issue of fact when the subject matter of the litigation falls outside the scope of the jury's knowledge.[20]

Further, Quillen's testimony regarding the use of a knuckle-mate is clearly inadmissible. Caniff's injury took place in December of 2004, and Quillen testified the knuckle-mate was not acquired by CSXT until 2009. According to Quillen's testimony, only then was transporting a knuckle viewed as being a "two-man job." This falls within the bar on evidence of subsequent remedial measures.[21] The majority acknowledges as much in a footnote, but attempts to deflect this fact by suggesting it may nonetheless be admissible under one of the exceptions to Kentucky Rules of Evidence (KRE) 407, including proof of feasibility. While this is legally correct, the record contains no evidence to support a belief that the feasibility exception may apply. CSXT never challenged the feasibility of two people carrying a knuckle together, and Caniff presented evidence that he possessed a mechanism to aid the joint transport of a knuckle without making reference to the knuckle-mate.

The majority also overlooks the only impartial testimony that touches upon the industry standard at the time of Caniff's injury. Along with his testimony contemplating the knuckle-mate, Quillen testified

---

18. See *Thompson*, 11 S.W.3d at 581.

19. See *Blair*, 323 U.S. at 602–04, 65 S.Ct. 545 (finding sufficient evidence where three men were required to move three greased, steel tubes weighing more than a thousand pounds each); *Ross v. Chesapeake & O. Ry. Co.*, 421 F.2d 328, 329–30 (6th Cir.1970) (finding sufficient evidence to support the jury's negligence verdict where plaintiff was required to move a six-hundred pound barrel).

20. See *Van Gorder*, 509 F.3d at 270 (holding that a plaintiff's own conclusory allegations

that the injury could have been prevented is not sufficient to prove negligence); *Peyton v. St. Louis Sw. Ry. Co.*, 962 F.2d 832, 834 (8th Cir.1992) (same); *Hurley v. Patapsco & Back Rivers R. Co.*, 888 F.2d 327, 329 (4th Cir. 1989) (same).

21. KRE 407 ("When ... measures are taken which would have made an [earlier] injury or harm ... less likely to occur, evidence of the subsequent [remedial] measures is not admissible to prove negligence....").

that before the knuckle-mate's adoption, he had carried knuckles alone and would have done so on the date of Caniff's injury. Absent expert testimony, I cannot conclude that this evidence was enough to raise a genuine issue of material fact sufficient to overcome CSXT's summary judgment motion.

Lastly, I am concerned that the majority's opinion will have a broader precedential impact than simply reversing the trial court's grant of summary judgment in the present case. In concluding that the trial court abused its discretion, the majority essentially holds that the trial court erred as a matter of law in concluding that the amount of manual or mechanical assistance that is reasonable to provide railroad workers falls outside the common knowledge of lay jurors.[22] In my opinion, this conclusion—coupled with the majority's implied belief that expert testimony is to be more readily required in cases of professional malpractice[23]—sets a disturbing precedent that requiring expert testimony to establish the standard of care in a tort case is no longer within the discretion of the trial court for causes of action that accrue outside a professional field like law or medicine. I cannot agree with an opinion that appears to remove the discretion that must reside in the trial courts because they "sit[ ] in the arena of litigation[,]"[24] and their sound judgment calls should be insulated from appellate revision.

For the foregoing reasons, I would hold that the trial court did not abuse its discre-

tion in requiring expert testimony and would affirm the holding of the Court of Appeals.

ABRAMSON, J., joins.

---

22. Majority opinion at 374 ("FELA can be readily understood by the jury without the aid of an expert witness."); Majority opinion at 375 ("Lay jurors can determine whether CSXT's actions were negligent in this case without any such testimony to explain to them the standards as they existed in the railroad industry at the time of Caniff's injury.").

23. Majority opinion at 372 ("CXST argues that we should not review this case under the

de novo standard set forth above[ ] but, rather, under the abuse of discretion standard set out in professional negligence (particularly medical malpractice) cases when the trial court is determining the necessity of an expert witness. We point out that, in those cases, the need for an expert is the rule rather than the exception.").

