Kathleen CHAMIS, Executrix of the Estate of Chris Chamis, Appellant

v.

ASHLAND HOSPITAL CORPORA-TION d/b/a King's Daughters Medical Center, Appellee

NO. 2015-CA-001071-MR

Court of Appeals of Kentucky.

OCTOBER 13, 2017; 10:00 A.M.

MODIFIED: NOVEMBER 3, 2017

BRIEF FOR APPELLANT: Gordon J. Dill Jr., Ashland, Kentucky.

BRIEF FOR APPELLEE: Kenneth Williams, Jr., David F. Latherow, Catherine C. Hughes, Ashland, Kentucky.

BEFORE: JONES, MAZE, AND NICKELL, JUDGES.

## OPINION

NICKELL, JUDGE:

Kathleen Chamis brings this appeal as Executrix of her late husband's Estate. She claims the trial court erroneously granted summary judgment to the hospital she believes negligently allowed him to fall from a bed on which she says all rails were not up as required by the care plan. In granting summary judgment to Ashland Hospital Corporation, d/b/a King's Daughters Medical Center (KDMC), the Boyd Circuit Court found the hospital was entitled to judgment as a matter of law and there were no genuine issues of fact. The issue on appeal is whether the *res ipsa loquitor* doctrine applied—eliminating the need for an expert witness—or whether expert testimony was needed to establish the hospital's expected standard of care, breach thereof and resulting injury. Upon review of the briefs, the record and the law, we affirm.

## FACTS

In 2004, Chris Chamis suffered a brain aneurysm leaving him paralyzed on his right side. He had other maladies including congestive heart failure, kidney disease, high blood pressure, high cholesterol, COPD and anemia. His wife, Kathleen, cared for him at home until 2009 when he was moved to Kingsbrook Lifecare Center where he resided until his death on February 17, 2014.

Between 2009 and 2012, Chris was hospitalized at KDMC several times. On December 12, 2012, at age 78, he was admitted for extreme weakness and fatigue. The

hospital deemed him to be at high risk for falling and placed a red band on his arm to alert staff to his status. As a further precaution, his care plan required all four bed rails to be in the up position and he was to ambulate only with the assistance of two persons.

On December 14, 2012, as was her usual routine, Kathleen left the hospital after Chris's evening meal around 7:00 p.m. Between her departure and 2:00 a.m. on December 15, 2012, Chris fell from his hospital bed, causing a wound to his forehead and an abrasion to his knee. Nurse Jennifer Murphy discovered him on the floor beside the bed with a bleeding head wound. According to Murphy's progress notes, Chris was alert and oriented to person, place and time.

Murphy notified the charge nurse, Kelly Latimer, who immediately went to Chris's room where she saw him on the floor. Chris talked with Murphy and Latimer and answered questions as he was helped back into bed. According to Latimer's deposition, all four bed rails were in the up position when she entered Chris's room. When asked if she knew how he had gotten to the floor Latimer stated, "Don't know. Never seen him get up out of bed before." Kathleen learned of Chris's fall in a telephone call around 2:30 a.m. Kathleen spoke briefly to Chris on the telephone; he said he guessed he was okay.

Dr. Martin Kassan, a plastic surgeon, sutured the wound on Chris's forehead; Dr. James Rice examined the abrasion on his knee. A CT scan revealed no intercranial bleeding or other abnormality. On December 18, Chris was discharged to Kingsbrook in good condition. In the next fourteen months, he was admitted to KDMC at least two more times.

On June 20, 2013, Chris filed a complaint against KDMC alleging negligence and failing to provide the minimum standard of professional care during his stay in December 2012 when he, assessed by the hospital to be a patient with a high risk of falling, fell and sustained permanent and debilitating injuries. After Chris's death, the case was revived with Kathleen as plaintiff in her capacity as Executrix of her late husband's Estate.

In its CR [1] 26 disclosure, the Estate named three expert witnesses—Dr. Kassan; Dr. Robert Klein, a cardiologist who treated Chris both before and after the fall; and three Kingsbrook employees who "treated the Plaintiff's decedent before the accident and will testify that the Plaintiff's decedent prior to the accident was incapable of climbing over the bed rails if they had been up." None of these individuals was offered as an expert on standard of care.

In its CR 26 disclosure, KDMC named several doctors who had treated Chris. One of them was Dr. Philip Fioret, a family medicine practitioner who also works with geriatric patients. He treated Chris both at KDMC and at Kingsbrook. He was not involved with Chris's December 2012 hospital stay. Dr. Fioret has been KDMC's Chief Medical Director since 1999.

When deposed, Dr. Fioret described Chris as generally oriented "to the moment" with occasional confusion and forgetfulness. Dr. Fioret was confident Chris knew his limitations and could converse with people. After the fall, Dr. Fioret noticed no changes in Chris's condition, stating his head wound had healed adequately. Dr. Fioret testified Chris lived at Kingsbrook nearly five years, far surpassing the average length of stay for most residents which is just one to two years. During his

---

1. Kentucky Rules of Civil Procedure.

stay, Chris experienced a "gradual but a consistent decline in his condition[.]" According to Dr. Fioret, Chris was hospitalized several times during his five years at Kingsbrook with each admission cumulatively weakening him and making him more prone to pneumonia.

In describing the value of bed rails, Dr. Fioret testified they are not "magical." They might prevent someone from falling out of bed, but a patient can "defeat" them. While Dr. Fioret was not present when Chris fell, he suggested Chris "could have pulled himself over with his left arm. I mean, he maybe grabbed the rail and just pulled." He went on to say,

> Could he move himself? Absolutely. Could he have pulled himself out of the bed? Absolutely. Would he have had a great chance of falling if he did so? Absolutely.

When asked about the nursing staff's performance and its adherence to the standard of care, Dr. Fioret responded:

> I believe the hospital was following established protocols that they had. That they had identified [Chris] as a risk. You know, there's sort of a three: Green, yellow, red. Red meaning the most likely of a fall, and we have to be very cognizant of that. He had been identified as a fall risk. He had been labelled as such with the band. It was in place. The nurses were coming in and they were trying to review with him. They were identifying his needs. They were doing all they could to try to prevent a fall from happening. So, based on my review, I do believe they followed the standard of care. Unfortunately, the reality is, you cannot 100 percent guarantee it's not going to prevent it, as we saw in this case.

Dr. Fioret is the only medical professional to be asked about, or to express an opinion upon, standard of care. His deposition found no deviation in the staff's handling of Chris's high risk of falling.

Kathleen was also deposed. She stated Chris suffered a stroke in 2004 from which he recuperated and in 2006 underwent open heart surgery. Thereafter, most of his hospital stays were for congestive heart failure—to remove fluid from his heart. With each KDMC admission he wore a red armband indicating a high risk for falling. In December 2012, Chris was admitted for weakness, fatigue, and shortness of breath. Kathleen stayed with him from about 8:00 a.m. until 1:00 or 2:00 p.m. each day, leaving the hospital and returning around 5:00 p.m. to have dinner with him, and then leaving for the night around 7:00 p.m. when Chris went to sleep. When asked whether the bed rails were customarily up when she arrived each morning during this particular admission, she stated only the top rails were usually up. She testified she "never" saw all four rails up even though she had requested it. She also stated she did not recall seeing a call light beside the bed and was certain there was no alarm on the bed as there had been during prior stays.

On June 3, 2015, KDMC moved for summary judgment arguing this was not a "slip and fall" case, but rather a medical malpractice case due to the nature of the claims—negligence and failure to provide minimum standard of care. KDMC maintained expert testimony was required to establish the degree of care and skill expected and that Chris fell because hospital staff deviated from the expected standard of care. While the Estate had listed several expert witnesses, none were to testify about standard of care and there was no proof any hospital action caused Chris to fall. KDMC also revealed Chris was found on the floor at Kingsbrook on January 12, 2013, having fallen while trying to get out of bed.

Responding to the summary judgment motion, the Estate argued no expert witness was required because this was a *res ipsa loquitor* case with Kathleen testifying Chris had limited mobility and could not get over the bed rails had they been in the up position. On June 19, 2015, the trial court granted summary judgment in hospital's favor. The Estate filed a timely notice of appeal.

## ANALYSIS

■ Granting summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. "The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky. App. 1996). Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hospital Co. v. Rose,* 683 S.W.2d 255, 256 (Ky. 1985)).

■ Ordinary negligence cases— which the Estate maintains describes this case—can be established without expert testimony. *See Caniff v. CSX Transp., Inc.,* 438 S.W.3d 368, 375 (Ky. 2014). Medical malpractice cases, however—which is how KDMC characterizes this case—usually require expert medical testimony to establish three things: "the applicable standard of care, any breach that occurred and any resulting injury to the plaintiff." *Blankenship v. Collier,* 302 S.W.3d 665, 667 (Ky. 2010). In some medical malpractice scenarios, expert testimony is not needed because the *res ipsa loquitor* doctrine allows negligence to be inferred from medical evidence in the record showing the risk of injury was extraordinary, its occurrence was within the defendant's exclusive control, and the plaintiff did not contribute to his own injury. *Andrew v. Begley,* 203 S.W.3d 165, 170 (Ky. App. 2006); *Perkins v. Hausladen,* 828 S.W.2d 652, 655 (Ky. 1992).

■ Requiring expert testimony is wholly within the trial court's discretion. *Green v. Owensboro Medical Health System, Inc.,* 231 S.W.3d 781, 783 (Ky. App. 2007). We will reverse only upon finding the trial court abused its discretion. *Id.*

■ Whether expert testimony is required in a hospital fall case depends on whether hospital personnel were exercising professional judgment as opposed to rendering nonmedical, administrative, ministerial or routine care, or simply carrying out doctor's orders. *McGraw v. St. Joseph's Hosp.,* 200 W.V. 114, 121, 488 S.E.2d 389, 396 (1997). If measures beyond standard or ordered care were obviously needed, an expert witness is unnecessary to establish staff members were negligent in not taking reasonable actions to protect the patient. *See Ratliff v. Employers' Liability Assur. Corp., Ltd.,* 515 S.W.2d 225, 228-29 (Ky. 1974) (collecting foreign cases).

■ Determining whether Chris was at a high risk of falling required an exercise in professional judgment. *Crosthwait v. Southern Health Corp. of Houston, Inc.,* 94 So.3d 1070, 1074-76 (Miss. 2012). Whether the four bed rails should have been in the up position and he should have ambulated only with the assistance of two

persons was another. Whether even more precautions were needed—even though Chris could speak and call for help—was yet another. Jurors would not automatically know of other options and whether they were advisable. Here, the depositions of Latimer and Dr. Fioret indicated adequate precautions had been implemented and carried out. Whether more measures—other than those routinely applied to all patients—should have been used to protect Chris required professional judgment and therefore, expert testimony. *Ratliff*, 515 S.W.2d at 230.

This was not an ordinary negligence case resolved by *res ipsa loquitor*. Expert testimony was necessary. We find no abuse of discretion and affirm the grant of summary judgment to KDMC.

MAZE, JUDGE, CONCURS.

JONES, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

JONES, JUDGE DISSENTING:

Respectfully, I dissent. While the majority opinion makes many excellent points, in my opinion, when the facts are viewed in a light most favorable to Chamis, I believe at least a portion of her claims should have survived summary judgment.

It appears to me that Chamis was arguing, at least in part, that the hospital failed to follow its own care plan because if the bedrails had been up, as required by the hospital's own care plan, the decedent could not have fallen out of bed because he was incapable of physically lifting himself over the rails. To the extent Chamis argued that the hospital's failure to follow its own care plan was the proximate cause of the decedent's fall, I believe her claim sounded in ordinary negligence; therefore, no expert medical testimony was necessary to establish the standard of care. *See, e.g., Martin v. Our Lady of Bellefonte Hospi-*

*tal, Inc.*, 2013-CA-000877-MR, 2014 WL 7339265, at *6 (Ky. App. Dec. 24, 2014) ("If the hospital had failed to follow steps mandated by its fall prevention plan in Larry's care, such failure would be sufficient to establish negligence without expert testimony.").

Of course, this in turn would require some proof that the rails were not in use. Chamis, who cared for the decedent for a number of years, provided an affidavit describing the decedent's physical condition and restrictions. His treating physician testified that Chamis was debilitated on his right side and could have put his right arm and leg across his body to roll over and get out of bed. He postulated that perhaps the decedent had used his left hand to pull himself over the rails on the left side of the bed and onto to the floor. Chamis denied that the decedent had the physical strength to do so. Based on the conflicting testimony, I believe it was up to the jury to determine whether the decedent had the ability to get himself over the rails had they been up.

> [A] jury could properly decide as a matter of common knowledge that if bed rails had been properly placed in accordance with defendant's own rule a person of plaintiff's age and physical and mental condition would have been prevented or deterred from leaving her bed on her own, and that defendant's failure to place side rails in these circumstances was a proximate cause of plaintiff's fall.

*Kadyszewski v. Ellis Hosp. Ass'n*, 192 A.D.2d 765, 766-67, 595 N.Y.S.2d 841, 843 (1993).

For these reasons, I dissent.