RENDERED: SEPTEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-001644-MR

NICOLE T. MCGUFFEY, AS
ADMINISTRATRIX OF THE
ESTATE OF JONATHAN C. MCGUFFEY                    APPELLANT

|  | APPEAL FROM FAYETTE CIRCUIT COURT |
| v. | HONORABLE JOHN E. REYNOLDS, JUDGE |
|  | ACTION NO. 14-CI-04220 |

RONALD HAMILTON AND
JASON LAMB                                        APPELLEES

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND KRAMER, JUDGES.

CALDWELL, JUDGE: Pursuant to the principle of circular indemnity, the Fayette

Circuit Court granted summary judgment to Jason Lamb and Ronald Hamilton on

Nicole McGuffey's claims stemming from her father's death due to injuries he

sustained in a moped accident. The accident was caused by oil which leaked from a tractor-trailer (the truck) driven by Lamb and owned by Hamilton. Because indemnity is premised upon parties being at unequal fault, we conclude summary judgment was inappropriate because the record does not show that Lamb and Hamilton have markedly different fault than Select Diesel Repair, a garage which had recently serviced the truck. We also conclude the trial court erred by requiring Nicole McGuffey, hereafter simply referred to as McGuffey, to have an expert witness to present legally cognizable claims that Lamb and Hamilton violated the Federal Motor Carrier Safety Regulations (FMCSR) and their Kentucky counterpart.

### INTRODUCTION AND GENERAL INDEMNITY PRINCIPLES

Usually we would begin by reciting this appeal's relevant procedural and factual history. But this is not the usual case because its outcome depends on understanding fully the thorny concept of indemnity, particularly one of its subsets, circular indemnity. Therefore, we deem it necessary to discuss the essential tenets of indemnity before relating the case's facts and procedural history.

Indemnity is a common law principle whereby a party seeks "restitution for damages he/she was required to pay for injuries sustained by another and which were entirely or primarily caused by the party against whom indemnity is sought." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 781-82

(Ky. 2000). Therefore, indemnity is a form of reimbursement, proper only if the party seeking it is only secondarily, or less, at fault than the party from whom it is sought. *See*, *e.g.*, *Ruby Lumber Co. v. K.V. Johnson Co.*, 299 Ky. 811, 187 S.W.2d 449, 450 (1945) ("The general rule is that before one who has paid damage may be entitled to indemnity or restitution from another, it is essential that such other should be primarily responsible for the negligent act which caused the injury."). Courts generally utilize the Latin phrase *in pari delicto* to describe a situation in which the parties are at roughly equal fault, in which case indemnity is unavailable, so for Lamb and Hamilton to be entitled to summary judgment based on indemnity they had to show they were not *in pari delicto* with Select Diesel. However, though "*in pari delicto*" means "[e]qually at fault[,]" BLACK'S LAW DICTIONARY (11th ed. 2019), courts do not require a showing that the parties are "literal 50/50 partners in the plaintiff's injury." *Stanford v. United States*, 948 F. Supp. 2d 729, 744 (E.D. Ky. 2013).

"[I]ndemnity traditionally shifts the entire loss to the tortfeasor who was actually at fault." 1 COMPARATIVE NEGLIGENCE MANUAL § 9:13 (2020). That shifting of the entire loss (*i.e.*, damages) is "[e]ssentially an all-or-nothing proposition . . . ." 1 AMERICAN LAW OF TORTS § 3:28 (2020). *See also Stanford*, 948 F. Supp. 2d at 745 ("Since the right [to indemnity] precedes the creation of several liability, it does not divide liability up among the parties. Rather, it is a

-3-

right of total indemnity. . . . Thus, a proper indemnity claim must allege that one tortfeasor deserves all or nearly all the blame for the plaintiff's injury.") (internal quotation marks and citations omitted). Consequently, indemnity has some characteristics of the ancient, discarded doctrine of contributory negligence, which has caused some jurists, both within and outside Kentucky, to question its continuing propriety in our modern, comparative negligence legal world. *See*, *e.g.*, *Degener*, 27 S.W.3d at 786-87 (Keller, J., dissenting) (referring to indemnity as "a relic from days gone by" and opining that "[t]he same principles of fundamental fairness that compelled the discarding of contributory negligence in favor of comparative negligence also compels the elimination of indemnity between joint tortfeasors who shoulder unequal fault"); *Eclectic Inv., LLC v. Patterson*, 357 Or. 25, 346 P.3d 468, 475 (Or. 2015) ("The doctrine of common-law indemnity was developed before comparative responsibility and is inconsistent with its framework."); *Memorial Sports Complex, LLC v. McCormick*, 499 S.W.3d 700, 708 (Ky. App. 2016) (Maze, J., concurring) (opining that indemnity was "not needed" and urging our Supreme Court to "take the opportunity to sort out the continued viability of contribution and indemnity and their proper relationship to statutory apportionment of fault. Doing so would alleviate a great source of confusion for trial courts and for juries."). Nonetheless, twenty years ago a majority of our Supreme Court held that common law indemnity, archaic though it

was to the dissenters, had survived Kentucky's transition from contributory negligence to comparative negligence. *Degener*, 27 S.W.3d at 780-81.

This case primarily involves a subset of common law indemnity known as circular indemnity. Under circular indemnity, a plaintiff's claims against a non-settling party are extinguished when a plaintiff settles with another party and agrees to hold the settling party harmless for claims made against it by the non-settling party—in other words, the plaintiff "would end up indemnifying another party for its own original claim." *In re El Paso Refinery, LP*, 302 F.3d 343, 350 (5th Cir. 2002). A typical hypothetical example would be: a plaintiff sues Roe and Doe; plaintiff settles with Doe and agrees to hold Doe harmless from claims brought against it by Roe; plaintiff receives a $100,000 judgment against non-settling party Roe; Roe then seeks, and receives, $100,000 from settling party Doe via indemnification; and the indemnification/hold harmless terms of the plaintiff's settlement agreement with Doe require plaintiff to reimburse Doe $100,000—the end result being plaintiff receives a $100,000 judgment from Roe but has to pay $100,000 to Doe.

Expending scarce judicial resources on allowing a plaintiff to pursue a judgment from one defendant on the front end which the plaintiff would have to essentially repay to another defendant on the back end is inefficient, if not pointless. Thus, circular indemnity acts to preclude a plaintiff's functionally

-5-

valueless claims against the non-settling party, Roe in our example, and under the trial court's reasoning, Lamb and Hamilton in the case at hand.

Applying those principles to the facts of this case, for circular indemnity to apply the record must show with the unmistakable clarity required to support granting summary judgment that: 1) Lamb and Hamilton are entitled to indemnity from the settling defendant, Select Diesel, and 2) McGuffey would have to repay (hold harmless) Select Diesel for Lamb and Hamilton's indemnity claims. *See In re El Paso Refinery, LP*, 302 F.3d at 350 ("In order to invoke circuity of action as a defense in this case, TRMI must show that two requirements are met. First, the non-settling defendant [TRMI] must be entitled to indemnity or contribution from the settling defendant [the Debtor]. Second, there must be an express or implied obligation on the part of the plaintiff [RHC] to hold harmless the settling tort-feasor [the Debtor] from further liability, by indemnity or contribution.") (internal quotation marks and citations omitted).

It is beyond dispute that McGuffey agreed to hold Select Diesel harmless, but Lamb and Hamilton's right to seek indemnification from Select Diesel is disputed. At this stage, the relative fault of Select Diesel *vis-à-vis* Lamb and Hamilton is hazy and "[i]ndemnity is not an issue until fault has been determined." *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 253 (Ky. 1995), *overruled on other grounds by Martin v. Ohio County Hosp. Corp.*, 295

-6-

S.W.3d 104 (Ky. 2009). Therefore, courts at the summary judgment stage must tread carefully before pretermitting claims based upon indemnity. Later in this opinion we will discuss precedent which illustrates when summary judgment based on indemnity is proper (when the relative fault of the parties is obvious) and when it is not (when the relative fault of the parties is murky). Distilled to its essence, summary judgment based upon indemnity is proper only when "the settling party [here, Select Diesel] was clearly the party at fault, and any liability of the nonsettling party [here, Lamb and Hamilton] was only through the settling party's fault." *York v. Petzl America, Inc.*, 353 S.W.3d 349, 354 n.5 (Ky. App. 2010).

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

Having set out the indemnity lens through which this case must be properly viewed, we now turn to relating this appeal's most germane underlying facts and procedural history. Hamilton owns a trucking company and employed Lamb as a truck driver. On July 21, 2014, Lamb picked up the truck from Select Diesel Repair in Dry Ridge, Kentucky, where it had undergone maintenance, including changing the oil and oil filter. According to Lamb, he performed a pre-trip inspection and then drove the truck from Dry Ridge to Frankfort, Kentucky, where he picked up a load of scrap metal. Lamb then drove the truck to Baker's Iron & Metal in Lexington, Kentucky, where he unloaded it, reloaded it, and went

-7-

back to Frankfort.  As was his routine, Lamb then went on a second run, driving the again reloaded truck back towards Baker's Iron in Lexington.

After exiting I-75 and turning south on North Broadway in Lexington, Lamb heard a buzzer sound and saw that the oil indicator light was illuminated. The oil pressure gauge then dropped to zero and the truck shut down, but Lamb managed to maneuver it to the median lane, where he coasted to a stop.  He activated the truck's flasher lights, placed safety triangles behind it, and called Hamilton.  At that point, according to Lamb's deposition, oil was pouring out of the truck.  Although Hamilton testified at his deposition that he had "no idea" who called the fire department, it is uncontested that fire department personnel eventually arrived to secure the scene and attempt to clean up the substantial amount of spilled oil.

Meanwhile, the decedent, Jonathan McGuffey, rode his moped in the opposite direction on North Broadway, going past the stranded truck and cleanup operation.  As he attempted to turn left from North Broadway onto a side street, his moped slipped on oil which had leaked from the truck as it passed through that area, causing the injuries which ultimately led to his unfortunate death.

After her appointment as administratrix, Nicole McGuffey, Jonathan McGuffey's daughter, filed a complaint alleging that the negligence of Hamilton and Lamb in failing to properly maintain the truck resulted in her father's wrongful

death. She subsequently amended her complaint to add negligence claims against Select Diesel in its maintenance and repair of the truck.

In December 2015, she settled her claims against Select Diesel and executed a release agreement. In relevant part, the release provides:

> It is further agreed that, in exchange for this settlement[,] Plaintiff, Nicole T. McGuffey, as Administratrix of the Estate of Jonathan McGuffey and on behalf of the Wrongful Death Beneficiaries of Jonathan McGuffey, agrees to indemnify and hold harmless [Select Diesel] . . . for all claims which were or could have been raised against them by any other party to the civil action currently pending before the Fayette Circuit Court, Division III, . . ., being Civil Action #14-CI-4220 in that court, or any other civil action arising from the subject incident which occurred on or about July 21, 2014 on North Broadway, U.S. Highway 27, in Lexington, Fayette County, Kentucky and/or the service and maintenance of a 2000 Freightliner owned by Ronald P. Hamilton and operated by Jason Lamb . . . .
>
> * * * *
>
> It is understood that this Release is intended to release only [Select Diesel]. . . . This Release has no effect upon Nicole T. McGuffey, as Administratrix of the Estate of Jonathan McGuffey and on behalf of the Wrongful Death Beneficiaries of Jonathan McGuffey's claims against other parties in the litigation currently pending before the Fayette Circuit Court, Division III, . . . being Civil Action #14-CI-4220.[1]

---

[1] Portions of the release were quoted in various documents in circuit court, and the full release was apparently provided to the trial court. But, for unknown reasons, a full copy of the release is not in the circuit court record before us. McGuffey attached a copy of it to her brief, and Lamb and Hamilton have not taken issue with her doing so, nor have they argued that the copy she attached is inaccurate and/or incomplete. Under those unique circumstances, we conclude our

-9-

Appellees Hamilton and Lamb thereafter filed two motions for summary judgment. The first claimed entitlement to summary judgment based upon McGuffey's failure to provide expert testimony to buttress her claim they had violated the FMCSR, the alleged violation(s) of which provided the basis for her negligence *per se* claims.[2] The second motion was based upon circular indemnity, specifically language in the release under which McGuffey agreed to indemnify Select Diesel and hold it harmless "for all claims which were or could have been raised against [it] by any other party" to the litigation (*i.e.*, Hamilton and Lamb).

The trial court granted both summary judgment motions. First, the court concluded that without expert testimony a jury would lack the necessary knowledge to evaluate Hamilton and Lamb's conduct concerning alleged violations of the FMCSR. Second, the court concluded that Lamb and Hamilton were not *in pari delicto* with Select Diesel in causing Mr. McGuffey's injuries; thus, the principles of circular indemnity foreclosed McGuffey's claims against them because McGuffey would have eventually had to reimburse Select Diesel for the indemnity claims it would have had to pay to Lamb and Hamilton. This appeal followed entry of the second summary judgment.

---

consideration of the release attached to McGuffey's brief is permissible and does not violate the rule generally preventing us from considering materials not found in the record.

[2] McGuffey originally had a trucking expert but failed to timely disclose the expert, so the trial court ruled the expert could not testify. After that, McGuffey argued, out of necessity, that she did not need an expert.

## ANALYSIS

### A.  Issues Presented

McGuffey contends neither summary judgment was proper.  As to the first, she argues the trial court improperly grafted the general rule requiring expert witnesses in medical malpractice cases onto her FMCSR claims.  She argues the second summary judgment was improper because the trial court erroneously concluded that Lamb and Hamilton were not *in pari delicto* with Select Diesel, which led it to foreclose her claims via misapplication of circular indemnity.  We agree with McGuffey that both summary judgment motions were improvidently granted.

### B.  Summary Judgment Standards of Review

We commence our analysis by reiterating the familiar, stringent summary judgment standards in Kentucky:

> The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.  Kentucky Rules of Civil Procedure (CR) 56.03.  There is no requirement that the appellate court defer to the trial court since factual findings are not at issue. *Goldsmith v. Allied Building Components, Inc.*, Ky., 833 S.W.2d 378, 381 (1992).  "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc*., Ky., 807 S.W.2d 476, 480 (1991). Summary "judgment is only proper where the movant

-11-

> shows that the adverse party could not prevail under any circumstances." *Steelvest*, 807 S.W.2d at 480, *citing Paintsville Hospital Co. v. Rose*, Ky., 683 S.W.2d 255 (1985). Consequently, summary judgment must be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor. . ." *Huddleston v. Hughes*, Ky. App., 843 S.W.2d 901, 903 (1992), *citing Steelvest, supra* (citations omitted).

*Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996).

### C. An Expert Witness Was Not Required

McGuffey argues the trial court abused its discretion in applying the general requirement that a plaintiff present an expert in medical negligence cases, as set out in *Blankenship v. Collier*, 302 S.W.3d 665 (Ky. 2010), to other types of claims. On the other hand, Lamb and Hamilton argue the jury would not be able to understand adequately the requirements imposed by the FMCSR without expert testimony. We agree with McGuffey, a conclusion which should not be a huge surprise since we and our Supreme Court have consistently refused to expand the *Blankenship* requirement of expert testimony to non-professional negligence cases.[3]

---

[3] We refer to professional negligence instead of medical negligence because we held an expert was required to present a cognizable legal malpractice claim in *Gleason v. Nighswander*, 480 S.W.3d 926, 929 (Ky. App. 2016). *See also* 4 LEGAL MALPRACTICE § 37.123 (2020) ("Whether an attorney has complied with the standard of care is an issue of fact, unless the evidence of negligence is so conclusive that reasonable persons can reach only one conclusion. Otherwise, expert testimony is necessary to establish the standard of care, since only an attorney can competently testify to whether the defendant met the prevailing legal standard.") (footnotes omitted). Having experts for legal or medical malpractice cases is premised upon the fact that

-12-

We concisely explained why expert witnesses are generally not required in non-professional negligence cases in *Stathers v. Garrard County Board of Education*, 405 S.W.3d 473, 479-80 (Ky. App. 2012):

> We begin by noting that "causation . . . presents a mixed question of law and fact." Therefore, whether a plaintiff's damage was caused by the tort defendant typically "should be left to the jury to determine." It is not surprising then that, **with the exception of [professional] malpractice cases, we could find no Kentucky appellate opinion affirming any grant of summary judgment based on a plaintiff's inability to establish, through expert testimony, the existence of a genuine issue of** . . . **material fact** . . . .

(Emphasis added) (footnote and citations omitted). No case since *Stathers* has imposed the requirement for an expert witness in medical negligence cases to claims not involving professional malpractice.

As underscored in *Stathers*, the pivotal question is whether, considering the record and the reasonable inferences therefrom, "it is still impossible, in a practical sense, for [an appellant] to prevail at trial." *Id*. at 481. A trial court's determination that an expert is required is reviewed on appeal for abuse of discretion. *Caniff v. CSX Transportation., Inc*., 438 S.W.3d 368, 374 (Ky.

---

doctors and attorneys receive lengthy, specialized education and the appropriate standards of performance for those professions are based upon that specialized training. Although the trucking industry is vital and requires some special skills, it is not based upon years of specialized training in areas generally unfamiliar to the general population. In short, McGuffey's claim that Lamb and Hamilton violated trucking regulations is qualitatively different than allegations of professional malpractice.

2014).  We readily conclude the trial court here abused its discretion by granting summary judgment to Lamb and Hamilton based upon McGuffey's failure to have an expert trucking witness.

An expert is not required simply because a plaintiff alleges violations of a federal regulatory system with which most jurors are likely unfamiliar.  In *Caniff*, for example, the trial court granted summary judgment to defendants in a case involving alleged violations of the Federal Employers Liability Act (FELA), which governs the railroad industry, because the plaintiff did not have an expert railroad industry witness.  *Id.* at 371.  Our Supreme Court found no expert was necessary, explaining its reasoning as follows:

> The case at bar is not a medical malpractice case, or any other type of professional negligence case.  At its root, this case is a normal "slip and fall" case.  Under FELA, the jury is asked to determine whether CSXT's negligence played *any* role in Caniff's injuries.  *Blankenship* is also unlike this case in that the trial court there granted summary judgment based upon an *undisputed* need for an expert witness.  There was no such undisputed need for an expert witness in the case at bar. . . .  Experts are often required in complex cases in which a jury will not understand, through common knowledge or experience, the intricacies involved in the negligence claim.  This is simply not one of those cases.  Here, the duty, breach, foreseeability, causation, and injury which Caniff must prove in order to succeed in his action under FELA can be readily understood by the jury without the aid of an expert witness.  Furthermore, there was no undisputed need for an expert, as existed in *Blankenship*. . . .  At any rate, we are at an utter loss as to why an expert would be required in a case such as this.

-14-

> Lay jurors can determine whether CSXT's actions were negligent in this case without any such testimony to explain to them the standards as they existed in the railroad industry at the time of Caniff's injury. While it would be within the discretion of the trial court to allow an expert witness to testify as to these industry standards in this case, it is not within its discretion to *require* as much in order for Caniff's case to survive a motion for summary judgment.

*Id.* at 373-375 (footnotes and paragraph breaks omitted). If an expert was not required to explain the railroad industry norms in a FELA case, we are similarly "at a loss" as to why an expert would be required to explain the trucking industry norms in this FMCSR case.

Having examined the record in the light most favorable to McGuffey and resolving all doubts in her favor, we, like the Court in *Stathers*, are persuaded that "it is not impossible for a jury to rule" in McGuffey's favor. *Stathers*, 405 S.W.3d at 481 (citing *Steelvest*, 807 S.W.2d at 480). Regardless of whether the claims presented are based upon strict liability, negligence *per se*, or simple negligence, the fundamental principles remain the same. We are confident that the jurors of this Commonwealth can understand adequately the requirements of the FMCSR and whether Lamb and Hamilton failed to satisfy them.

We recognize that Lamb and Hamilton have identified experts who will purportedly testify that they did not violate the FMCSR.[4] Perhaps a jury will find that testimony carries conclusive weight. Perhaps not. But the issue is not whether Lamb and Hamilton's experts will prove to be more persuasive than McGuffey's lay witnesses; the issue is whether it was *impossible* for McGuffey to prevail without presenting an expert trucking witness. It was not. *See Chamis v. Ashland Hospital Corp.*, 532 S.W.3d 652, 656 (Ky. App. 2017) ("Ordinary negligence cases . . . can be established without expert testimony. Medical malpractice cases, however . . . usually require expert medical testimony . . . .") (citation omitted). Consequently, the trial court abused its discretion by granting summary judgment to Lamb and Hamilton based solely upon McGuffey's failure to produce expert testimony to support her claims of negligence *per se*.

**D. The Record Does Not Show That Lamb and Hamilton Had a Clear, Unmistakable Entitlement to Claim Indemnity from Select Diesel**

Turning now to the judgment holding that Lamb and Hamilton were not *in pari delicto* with Select Diesel and are thus entitled to indemnity as a matter of law, we are again convinced that summary judgment was inappropriate. Lamb and Hamilton claim circular indemnity is triggered by language in the release by

---

[4] The record only contains identification of those experts, not their reports. In any event, McGuffey's claims are not automatically extinguished just because the defendants retained experts in this non-professional negligence case.

which McGuffey agreed to indemnify Select Diesel and hold it harmless "for all claims which were or could have been raised against them by any other party" to the litigation. The question on summary judgment is whether the record shows that it would be impossible for McGuffey to prevail. And for McGuffey to overcome circular indemnity at the summary judgment stage, the record must show a possibility that Lamb and Hamilton were *in pari delicto* with Select Diesel. That possibility exists here.

**1. There Is Not Sufficient Evidence to Show Select Diesel Was Primarily at Fault**

First, in our view, Lamb and Hamilton are raising what amounts to a *res ipsa loquitur* (the thing speaks for itself) argument: the fact that the oil spill occurred on the day that Lamb picked up the tractor trailer from Select Diesel means Select Diesel's negligence caused the oil to leak. It is possible that may turn out to be accurate. But the question is whether summary judgment was proper based upon what the record shows *now*, not what it may show *later*.

Lamb and Hamilton cite to nothing specific in the record to show that the temporal relationship between maintenance performed by Select Diesel and the leaking oil means that Select Diesel inevitably caused the leak. Specifically, the record does not contain affidavits or depositions by expert witnesses or lay persons with first-hand knowledge opining that the leak was caused by Select Diesel and

Select Diesel has not admitted any negligence or responsibility for the oil leak. Generally, "[s]uspicion is not legally sufficient to support a finding of causation in a tort case: that evidence of an event followed closely by manifestation of conditions which did not appear before the event raises only suspicion that the event at issue caused the condition." 86 C.J.S. *Torts* § 104 (2020). And even if Select Diesel negligently performed repairs, a jury could conclude that Lamb and Hamilton were also negligent.

Lamb drove the truck extensively between the time he picked it up from Select Diesel and the time he had to pull into a median due to the leaking oil. It is common knowledge that a vehicle can be damaged any time it is driven—especially if the vehicle is driven multiple times to scrap yards. It is also common knowledge that mechanical parts do not have an unlimited lifespan and thus can, and do, malfunction at any time, even absent negligence. Indeed, we do not know *exactly* when the oil first began to leak.

Moreover, in seeming contradiction to his current position, at his deposition Hamilton absolved Select Diesel from any responsibility for the oil leak.[5] Lamb similarly agreed at his deposition that he had no "firsthand

---

[5] The following colloquy occurred at Hamilton's deposition:

> Q [by McGuffey's then-counsel] At one point there was an allegation that Donato, or Select Diesel Repair, per your pleadings had some responsibility in the subject oil leak. Do you recall that?
> A [by Hamilton] No, I do not.

knowledge" of what caused the oil leak at issue. *Neither do we*. A court cannot presume and assume its way to summary judgment. Because the record does not show conclusively the fault, if any, attributable to Select Diesel and/or Lamb and Hamilton in causing the oil leak which ultimately led to Mr. McGuffey's tragic death, we cannot say that Select Diesel was primarily liable with Lamb and Hamilton having only distant, secondary liability.

## 2. Lamb and Hamilton's Heightened Duties

In addition to liability for the leak being unclear, Lamb and Hamilton also had additional duties under the FMCSR since Lamb is a professional truck driver possessing a Commercial Driver's License (CDL) and Hamilton has a CDL and owns a commercial trucking company. In fact, neither Lamb nor Hamilton denies that he is subject to the requirements of the FMCSR.

---

Q Do you feel or is it your position that Donato, or Select Diesel Repair, had any contribution to this oil spill at all?
A No.
Q Per your investigation, should Select Diesel Repair have discovered this check oil valve leak prior to the date of the incident?
A No.
Q Did a representative from Donato express to you an opinion as to what caused the check valve failure?
A After the fact?
Q Yes, sir.
A It was just, you know, his opinion that that could happen, him being a mechanic.

Record (R.) at 938-39.

Both the federal government and Kentucky's state government have imposed heightened duties upon persons involved in the trucking industry. Indeed, at his deposition Hamilton agreed that commercial, professional truck drivers have a "heightened standard of care, exceeding that . . . expected of the citizens on the roadway . . . ." For example, pertinent to this case, 49 Code of Federal Regulations (C.F.R.) § 396.5 provides: "Every motor carrier shall ensure that each motor vehicle subject to its control is—(a) Properly lubricated; and (b) Free of oil and grease leaks." Kentucky adopted large portions of the FMCSR for commercial motor vehicles, including 49 C.F.R. § 396. *See* 601 Kentucky Administrative Regulations (KAR) 1:005 § 2(11). Therefore, both Lamb and Hamilton had a specific duty to ensure the tractor-trailer was not leaking oil.

Lamb also had a specific duty to make sure the tractor-trailer was "in safe operating condition" before driving it under 49 C.F.R. § 396.13(a).[6] Indeed, Lamb testified at his deposition that the truck at issue was taken for repairs or

_____

[6] McGuffey's complaint specifically cited only to § 396.5 but generally alleged that Hamilton and Lamb had not "properly maintain[ed]" the tractor-trailer at issue. R. at 28. 49 C.F.R. § 396.3 mandates that "[e]very motor carrier and intermodal equipment provider must systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles and intermodal equipment subject to its control." Therefore, though better practice would have been to specifically cite to §§ 396.3, 396.11, and 396.13, the complaint contains allegations which are at least the functional equivalent of the requirements of those regulations. Indeed, it is beyond serious dispute that commercial trucking companies and drivers have a duty to properly maintain commercial trucks. In short, any omission of an exact citation to any applicable provision of the FMCSR does not relieve Lamb or Hamilton from their obligation to properly inspect and maintain the truck at issue.

-20-

service, some admittedly minor, fifteen times between February 2014 and when the oil leak occurred in July 2014. But Lamb admitted that he noted none of those fifteen repairs on his daily vehicle inspection reports, as is required by §§ 396.11 and 396.13. Lamb also agreed that a trucking company with twenty-four safety violations like Hamilton's company incurred in an eight-month period, which we will soon discuss, needed to "reevaluate or remedy its system of inspection of safety equipment . . . ." Lamb also testified that Hamilton "took fairly good care of the equipment." But a jury could have reached divergent conclusions as to whether Hamilton and Lamb met their FMCSR inspection, repair, and reporting duties.

Moreover, Lamb testified that Hamilton did not guarantee Lamb could drive an alternate truck when Lamb's assigned truck was being repaired. Thus, Lamb's income was potentially negatively impacted whenever his truck needed repairs or maintenance since he was paid by the load and so did not earn money unless he was driving. A jury could conclude that system created a perverse financial disincentive for Lamb to get his assigned truck serviced.

Turning to Hamilton, he testified at his deposition that he did not train Lamb on how to perform the requisite pre-trip inspections, nor did Hamilton's company have written policies governing pre-trip inspections. Moreover, Hamilton failed to notice, or at least failed to correct, some reports submitted by

Lamb which were deficient. Indeed, Hamilton admitted his drivers and trucks had been cited numerous times by Kentucky and Ohio officials for violations, such as not having properly operating turn lights and having defective breaks; yet he made no changes to his company's procedures. In fact, Hamilton did not even reprimand a driver (not Lamb) who received eight violations in Kentucky, and an oil leak violation in Ohio, during a single month in 2014.

Hamilton also answered no when asked if Lamb's driver's log sheet/time sheet for the date of the oil leak showed Lamb had engaged in a pre-trip inspection. Hamilton testified that he believed a fifteen-minute listing of "on duty, not driving" from 2:00 a.m. on the time sheet covered a time when Lamb performed his pre-trip inspection. Lamb testified that he performed a pre-trip inspection, which included looking at the "engine bay" at 4:30 to 5:00 a.m., then later testified he performed an inspection from 2:00 to 2:15 a.m. He also testified that he noticed no issues or defects with the truck's "oil system" during that inspection.

Perhaps a jury would agree Lamb and Hamilton performed their respective FMCSR duties, including conducting a proper pre-trip inspection the day of the oil leak; perhaps not. But that is the point. The trial court ruled as a matter of law that Lamb and Hamilton were not *in pari delicto* with Select Diesel, implicitly accepting the argument that the lion's share of fault lay at the feet of

Select Diesel.  But that conclusion has no solid evidentiary ground upon which to rest; by contrast, there is evidence in the record from which a reasonable juror could conclude that Lamb and Hamilton failed to meet their FMCSR duties.

Given that, how then may it be reasonably said that it would be *impossible* for McGuffey to show that Select Diesel and Lamb and Hamilton were *in pari delicto*?  To ask the question is to answer it.  Since the record here does not support a conclusion that, as a matter of law, Select Diesel was primarily responsible for the oil leak, the trial court erred by finding Select Diesel and Lamb and Hamilton were not *in pari delicto*.

**3.  Precedent Holding That Indemnity Was Proper Is Distinguishable Because There Was an Obvious Allocation of Fault in Those Cases**

We will not burden this already lengthy opinion by discussing each case cited by the parties.  Instead, we will discuss three of the main cases:  *Brown Hotel Company v. Pittsburgh Fuel Company*, 311 Ky. 396, 224 S.W.2d 165 (1949); *Crime Fighters Patrol v. Hiles*, 740 S.W.2d 936 (Ky. 1987); and *Butt v. Independence Club Venture, Ltd.*, 453 S.W.3d 189 (Ky. App. 2014).  Each of those cases, along with the others cited by the parties in which indemnity was found to apply, have distinguishable facts but share a common core:  it was plain which

-23-

parties were primarily liable and which were only secondarily liable—*i.e.*, there could not be a reasonable dispute that the parties were not *in pari delicto*.

### a. *Brown Hotel Company v. Pittsburgh Fuel Company*

We begin with *Brown Hotel*, which remains the keystone case in Kentucky indemnity law despite being rendered over seventy years ago. In that case, "[a]n employee of the appellee, Pittsburgh Fuel Company, left insecure the lid of a manhole into which he had unloaded coal, and a pedestrian was injured when it turned with him." 224 S.W.2d at 166. Even though Kentucky was then still using contributory negligence, "[a] judgment for $5,277 for damages was rendered against the fuel company and the Brown Hotel Company. The verdict specified each should pay an equal part." *Id.* The issue was whether Brown Hotel, via its insurer, was entitled to indemnity from Pittsburgh Fuel Company.

The former Court of Appeals began its analysis by setting forth the basic principles of indemnity, which have subsequently been cited numerous times by Kentucky appellate courts:

> The general common law rule that a joint tort feasor who is compelled to pay damages for the negligent or tortious act of another is not entitled to indemnity from the latter has become subject to so many exceptions and limitations—resting upon reasons at least as forceful as those which support the rule itself—the rule has become so narrow that it can hardly with propriety now be called the general rule. The general rule has become the specific rule only where joint tort-feasors were in pari delicto—equal fault. Other than that, the socalled [sic]

-24-

exceptions have become rules themselves. An Act of 1926, now Kentucky Revised Statutes 412.030,[7] authorizing contribution among tort-feasors where the wrong reflects no moral turpitude, abrogated the so-called general rule but made no change in the exception which allows the right of indemnity where the person seeking it and the person from whom it is sought are not in pari delicto, as where the party who was compelled to pay the damages was less culpable than the other wrongdoer, although both were equally liable to the person injured. Where one of two parties does an act or creates a hazard and the other, while not concurrently joining in the act, is, nevertheless, thereby exposed to liability to the person injured, or was only technically or constructively at fault, as from the failure to perform some legal duty of inspection and remedying the hazard, the party who was the active wrongdoer or primarily negligent can be compelled to make good to the other any loss he sustained.

*Id.* at 166-67 (citations omitted).

The Court in *Brown Hotel* held that indemnity was proper because it was clear that Pittsburgh Fuel was primarily responsible for the pedestrian's injuries—*i.e.*, it was inarguable that the hotel and fuel company were not *in pari delicto*:

The primary, efficient and direct cause of the accident was the positive antecedent negligence of the fuel company's employee in failing to replace the manhole lid securely. This exposed the hotel company to liability. Its fault was a negative tort in failing to check upon the

---

[7] Unchanged since its enactment in 1942, Kentucky Revised Statutes (KRS) 412.030 provides in its entirety that "[c]ontribution among wrongdoers may be enforced where the wrong is a mere act of negligence and involves no moral turpitude."

-25-

act of the coal delivery man and in failing to observe its affirmative duty to the public to see that the way was free of obstruction or the pitfall. Both were in fault but not the same fault toward the party injured. The employees of the two companies were not acting jointly or concurrently or contributorily in committing the tort. They were not *in pari delicto*.

. . .

Under the common law rule there may be complete indemnity where one party's liability is secondary because it arose from the negligence of the other party and would not have arisen but for it. This right is not derived from the statute but stands entirely on principles of equity.

*Id.* at 167-68.

The trial court reasoned that, like the hotel employees in *Brown*, Hamilton and Lamb's fault was secondary, stemming from a failure to check the proper performance of another party. The trial court concluded that the oil leak was "because of the failure of the oil filter installed by Select Diesel." However, there is insufficient evidence to support that sweeping conclusion. The fact that the oil spill occurred on the day that Lamb picked up the tractor-trailer from Select Diesel does not inevitably lead to the conclusion that Select Diesel's negligence was the sole cause of the accident, as has previously been discussed. Select Diesel has not admitted liability, nor has its liability, if any, been proven. Without liability, there cannot be indemnity. *Clark*, 910 S.W.2d at 253. Moreover, the trial

court failed to address the heightened duties of Lamb and Hamilton under FMCSR, or the alleged violations thereof.

Even if it is ultimately determined that the only reason the truck driven by Lamb on the day in question spilled oil onto the road was because of the improper work performed by Select Diesel, Lamb and Hamilton would not be automatically relieved of *all* liability. Regardless of the reason the truck lost oil, Lamb, as the driver, had a duty to operate the truck in a manner consistent with the commercial trucking industry guidelines **at all times**, even—especially—when other hazards appear. Regardless of the cause of the mechanical failure, commercial truck drivers have an unflagging duty to inspect and then operate commercial vehicles in a safe manner and a failure to do so can implicate liability. Did Select Diesel negligently perform maintenance on the truck? Maybe. Did Lamb inspect the truck fully and react appropriately and timely to the oil spill? Maybe. Did Lamb and Hamilton make sure the truck was properly maintained? Maybe. Was Select Diesel's alleged negligence primary, with Lamb and Hamilton's being only secondary? Maybe. Maybes are insufficient to warrant summary judgment.

#### b. *Crime Fighters Patrol v. Hiles*

In *Hiles*, Robert Cook, a customer at a White Castle fast food restaurant, attacked another customer, Larry Hiles. Hiles sued White Castle for

failing to exercise reasonable care in preventing the assault; White Castle filed a third-party complaint against Crime Fighters Patrol, the security company it had hired. 740 S.W.2d at 937. White Castle also filed a third-party complaint against Cook, seeking indemnity. Crime Fighters Patrol, in turn, filed a cross-claim against Cook, also seeking indemnification. *Id.* Cook filed an answer, alleging Hiles had executed a release that provided in relevant part that Hiles would "indemnify and forever hold harmless" Cook "against loss from any further claims . . . brought against him by anyone for the purpose of enforcing a further claim for damages on account of my injuries sustained on or about March 13, 1982, specifically including any claims for contribution and/or indemnification." *Id.*

Like the case at hand, the trial court concluded that release entitled White Castle and Crime Fighters Patrol to summary judgment on Hiles' claims via application of circular indemnity. *Id.* After aptly noting that trying to apply the principles enunciated in *Brown Hotel* led courts to experience "much difficulty[,]" the Court framed the issue as follows:

> Thus, we must decide whether the alleged negligent acts of White Castle and Crime Fighters Patrol should be considered "*in pari delicto*" with Cook's wrongful acts in causing Hiles' injury, in which case White Castle and Crime Fighters Patrol have only a claim for statutory contribution or partial indemnity, extinguished only by half because of the indemnity agreement from Hiles to Cook, or whether White Castle and Crime Fighters Patrol have a claim over against Cook for complete indemnity

extinguished completely by the promise of indemnity
from Hiles to Cook.

*Id.* at 938-39.

After an extensive discussion of the Restatement (Second) of Torts,

the Court concluded summary judgment based upon circular indemnity was

proper:

> The basic allegation by Hiles against White Castle,
> and the fundamental fact that requires summary
> judgment, is that the appellants, White Castle and Crime
> Fighters Patrol, have at most failed to prevent an assault
> by Cook upon Hiles. They did not participate in making
> the assault. The issue must be resolved against the
> appellees even if we accept the case as they put it in their
> Brief, "an affirmative duty on the part of a business
> establishment to protect its business invitee from attacks
> of another business patron." The fact pattern is
> analogous to the situation in *Brown Hotel* where the
> Pittsburgh Fuel Company left the lid of a manhole
> insecure and the Brown Hotel failed to maintain its
> premises free from this dangerous condition. It calls for
> complete indemnification.
>
> . . .
>
> [A]s between White Castle and Crime Fighters Patrol,
> whose negligence, if any, consisted of failing to prevent
> the assault, and Cook, who perpetrated the assault,
> applying equitable principles the parties are not *in pari
> delicto*; White Castle and Crime Fighters Patrol would be
> entitled to complete indemnity from Cook. This is a case
> where there is no disagreement as to the material facts.
> The only dispute is the legal significance of those facts.
> A summary judgment is proper.

*Id.* at 939-41.

-29-

Though portions of *Hiles* may not be written in optimally clear and concise language, its basic premise is the same as *Brown Hotel*: indemnity is proper when the undisputed facts show one party is obviously the primary cause of a plaintiff's injuries. As discussed, there is no such obviousness here so *Hiles* does not support granting summary judgment to Lamb and Hamilton.

### c. *Butt v. Independence Club Venture, Ltd.*

*Butt*, the third main case relied upon by Lamb and Hamilton, involves indemnity in light of the Kentucky Dram Shop Act. After leaving a bar owned by Independence Club Venture, Ltd. (Independence), an intoxicated driver, Nathan King, was involved in a fatal accident which killed three of his passengers and injured the fourth, Bruce Butt. 453 S.W.3d at 191. The estates of the deceased passengers and Butt settled their claims with King and his insurer. As part of the settlement, the estates and Butt executed a release which stated in relevant part that it was not intended to "preclude" claims against "potentially responsible parties, such as liquor stores, restaurants, bars, and the like," but the estates and Butt were obligated to "hold harmless, and to indemnify [King and his insurer] from any and all claims, liens, causes of action, demands or suits of any kind which may have been brought because of the accident . . . or for any amount that they . . . may be hereafter compelled to pay on account of any claims arising out of the accident . . . ." *Id.*

-30-

Over nine months after executing the release, the estates and Butt sued Independence, "alleging that it violated Kentucky's Dram Shop Act by negligently serving alcohol to King on the evening of February 28, 2010, and that said negligence was a substantial factor in causing the accident." *Id.* at 191-92. The trial court granted summary judgment to Independence on circular indemnity grounds. *Id.* at 192. The estates and Butt appealed.

After discussing, among other things, *Hiles*, we concluded:

> We are cognizant of the effect that this opinion will have on Appellants. Nevertheless, we cannot construe the release document in variance to its plain and unambiguous language regardless of what Appellants now assert was its intent. We believe that there is no conclusion that can be reached other than any cause of action against Appellee is moot because there ultimately can be no recovery of damages.
>
> We conclude that the rationale set forth in . . . *Hiles* is dispositive herein. Although Appellants preserved their right to pursue a cause of action against Appellee [Independence], the "hold harmless" provision effectuates a release of any dram shop liability. Accordingly, we are compelled to agree with the trial court that "[Appellants] are precluded from any recovery against [Independence] because it would then be entitled to indemnity against King for the amount of any recovery, and [Appellants] would be required to hold King harmless to the extent of the indemnification." Again, this is the "circuity of litigation" that courts must avoid.

*Id.* at 195.

-31-

Superficially, *Butt* resembles the case at hand in that there was a release with a seemingly broad hold harmless/indemnity provision which lived in odd, uneasy juxtaposition with another clause stating that the release was not intended to impact a plaintiff's right to pursue claims against other allegedly liable, non-settling parties. However, there is a materially distinguishing feature between this case and *Butt*: the Dram Shop Act specified King, the consumer of alcohol, was primarily liable, leaving the dram shops only secondarily liable. In other words, the General Assembly had enacted a law which made it impossible for King and Independence to be *in pari delicto*.

KRS 413.241(1) and (3) generally mandate that consuming, not serving, alcohol "is the proximate cause of any injury, including death and property damage, inflicted by an intoxicated person upon himself or another person" and so "[t]he intoxicated person shall be primarily liable with respect to injuries suffered by third persons." Consequently, retail furnishers of alcoholic beverages, like Independence, may only be secondarily liable. "Thus, KRS 413.241 dispelled the suggestion . . . that the dram shop and the drunken driver ought to be considered in pari delicto." *DeStock No. 14, Inc. v. Logsdon*, 993 S.W.2d 952, 957 (Ky. 1999) (footnote omitted).

In short, dram shop actions are well-suited for claims of indemnity because, as a matter of public policy, the liability of the consumer of alcohol and the furnisher of the alcohol is settled. As our Supreme Court held in *DeStock*:

> Since Logsdon [the consumer of alcohol] and DeStock [the furnisher of alcohol] were not in pari delicto and Logsdon is primarily liable and DeStock only secondarily liable to Reid and Alvey [injured plaintiffs who settled their claims against Logsdon and sued DeStock], DeStock will be entitled to indemnity against Logsdon for any sums it is required to pay in damages to them . . . . Unlike the situation presented in *Crime Fighters Patrol v. Hiles*, Ky., 740 S.W.2d 936 (1987), we are not required in this case to address the policy issue of whether the dram shop ought to be deemed in pari delicto with the drunken driver or whether it ought to be only secondarily liable, because that policy issue was decided by the legislature when it enacted KRS 413.241. This conclusion nullifies the basis for Logsdon's summary judgment against DeStock, *i.e.*, that the respective liabilities of the dram shop and the drunken driver must be apportioned in accordance with KRS 411.182 . . . . Since it has been legislatively determined in KRS 413.241(1) that DeStock's negligence did not proximately cause Reid's and Alvey's injuries, comparative fault and apportionment are inapplicable to a determination of DeStock's liability. As far as Reid and Alvey are concerned, KRS 413.241(2) imputes Logsdon's liability to DeStock and recovery can be had against either or both. However, as between Logsdon and DeStock, KRS 413.241(3) declares Logsdon to be primarily liable and DeStock only secondarily liable, which entitles DeStock to the remedy of indemnity.

*Id.* at 957-58 (paragraph breaks omitted).

Obviously, this is not a dram shop case and there is no statute declaring as a matter of public policy that Select Diesel or Lamb and Hamilton are primarily liable here. Therefore, *Butt* is materially distinguishable and does not support the trial court's granting summary judgment to Lamb and Hamilton.

### d. *York v. Petzl America, Inc.*

By contrast, perhaps the clearest statement on why summary judgment based upon indemnity is inappropriate when there is uncertainty as to the respective liability of various parties may be found in our decision in *York*, 353 S.W.3d 349. In *York*, Matthew York was injured in a rappelling class and sued the maker of the rappelling harness, Petzl, and the class instructor and supervisor, Charles Sparks and Charles Shaw. *Id.* at 351. Petzl filed indemnity-based cross-claims against Sparks and Shaw. *Id.* York settled with Sparks and Shaw, and executed a release which required York to "indemnify . . . and hold harmless [Shaw and Sparks] from any and all other claims, cross-claims, damages, demands, actions or causes of action by any party, including, but not limited to [Petzl], for reimbursement of any sums paid to or on behalf of [York] as a result of the injuries or damages allegedly sustained which is the subject of the lawsuit." *Id.*

Sparks and Shaw then moved for summary judgment on Petzl's cross-claims, but the trial court held that Petzl was entitled to common law indemnity from them. *Id.* at 352. Petzl then was granted summary judgment on York's

claims against it based upon circular indemnity principles.  When York appealed,

we held in relevant part:

> In this case, taking every allegation in Petzl's cross-claim as true, the fact remains that no agency or quasi-agency relationship existed between the parties, *nor can it be said with complete certainty that any negligence on the part of Sparks or Shaw was the entire or primary cause of York's injuries.  Rather, a jury could decide that York was injured solely as a consequence of Petzl's failure to design the rappelling harness correctly or Petzl's failure to supply proper warnings regarding the use of the harness.  A jury might also determine that Petzl, Sparks, and Shaw were all equally liable, or in pari delicto, which would bar any claims for indemnity by Petzl.  Accordingly, we conclude that summary judgment was not appropriate in this situation.*
>
> Moreover, it is a well-established principle that one cannot be required to indemnify if one is not liable. *In this case, no determination of liability has been made with regard to Shaw or Sparks.*
>
> The agreement states that York will indemnify and hold harmless Shaw and Sparks "from any and all other claims, cross-claims, damages, actions or causes of action by any party, including, but not limited to [Petzl] . . . ." *At this point, there has not been a determination that Shaw and Sparks have any fault or liability whatsoever on any claim or cross-claim.*  Rather, the agreement specifically states that "[t]he parties to this Settlement Agreement and Release understand, acknowledge and agree that the damages, expenses, and fees that they have allegedly sustained and the alleged legal liability are disputed and denied[.]"  The agreement further states that "the payment is not to be and will not be construed as an admission of liability on the part of [Sparks and Shaw]."

> *As the Kentucky Supreme Court stated . . .*
> *"[i]ndemnity is not an issue until fault has been*
> *determined."* [*Clark*, 910 S.W.2d] at 253. *Therefore,*
> *because there was no determination made regarding*
> *Sparks's and Shaw's liability, there could be no summary*
> *judgment on the issue of common law indemnity at that*
> *point.*
>
> Under Kentucky's comparative fault principles, the
> jury should be instructed to apportion liability in
> proportion to the fault of each defendant (as well as to
> York, if appropriate), as KRS 411.182 provides for fault
> to be apportioned to a settling party. Assuming Petzl's
> allegations in the cross-claim are true and the jury agrees,
> the amount of the accident caused by the negligence of
> Sparks and Shaw will be apportioned to them and not to
> Petzl. Petzl will be liable only for its own negligence, if
> any.

*York*, 353 S.W.3d at 354-55 (emphasis added) (footnote omitted).

The fundamental similarities between *York* and the case at hand are striking. In both cases, a plaintiff settled with some parties, reserving claims against others. The settlement agreement in both cases expressly stated the settling defendant was not admitting to having any liability for the plaintiff's injuries and required the plaintiff to indemnify/hold harmless the settling defendant from claims which could be made by the non-settling defendant(s). The non-settling defendants moved for summary judgment on circular indemnity principles in both cases. However, the respective liabilities of the settling and non-settling defendants were not plain in either case. Therefore, it could not be said as a matter of law that the settling defendant and non-settling defendants were not *in pari*

*delicto*, so the non-settling defendants were not entitled to summary judgment based upon circular indemnity. In fact, summary judgment is even more inappropriate here than in *York* because of the heightened FMCSR duties imposed upon Lamb and Hamilton and the evidence from which a reasonable jury could conclude they failed to satisfy those duties.[8] Thus, this case falls squarely within our general pronouncement in *York* that when a case involves disputed, or unknown, facts "the question of whether there should be indemnity is a question of law *once the facts have been determined by a jury*." *Id.* at 353 (emphasis added).

## CONCLUSION

For the foregoing reasons, the Fayette Circuit Court twice improvidently granted summary judgment to Jason Lamb and Ronald Hamilton. Accordingly, we reverse each of the summary judgments at issue in this appeal and remand the case to the Fayette Circuit Court for further proceedings consistent with the opinion.

---

[8] Another case in which a court concluded indemnity was improper because the parties were *in pari delicto* is *Lahutsky v. Wagner Moving & Storage, Inc.*, No. 5:10-CV-00007-R, 2011 WL 5597330 (W.D. Ky. Nov. 17, 2011), which we cite briefly because of its prominence in the parties' briefs and trial court's order. In that case, a plaintiff sued a business after falling on icy stairs because the business failed to install a handrail or canopy, as required by the Kentucky Building Code; the business filed a third-party complaint for indemnity against the company who constructed the stairs. *Id.* at *1. The court held the business was not entitled to indemnity from the construction company because the business had apparently consciously chosen to not ask the construction company to install a handrail or canopy. *Id.* at *14-15. In short, the court came to the unremarkable conclusion that indemnity was inappropriate because the parties were *in pari delicto*.

-37-

ALL CONCUR.

BRIEF AND ORAL ARGUMENT
FOR APPELLANT:

Karl Price
Louisville, Kentucky

BRIEF FOR APPELLEES:

Gregg E. Thornton
Jillian D. House
Betsy R. Catron
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLEES:

Gregg E. Thornton
Lexington, Kentucky